IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HYUN JU PARK,<br><br>    Plaintiff,<br><br>    vs.<br><br>CITY AND COUNTY OF HONOLULU;<br>ANSON KIMURA, STERLING NAKI;<br>JOSHUA OMOSO; DOE<br>ASSOCIATIONS 1-5; and JOHN<br>and/or JANE DOES 1-10,<br><br>    Defendants. | )<br>)<br>)<br>)<br>) Civ. No. 17-00142 ACK-KSC<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER GRANTING DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

For the reasons discussed below, the Court GRANTS Defendant City and County of Honolulu's Motion to Dismiss the Second Amended Complaint, ECF No. 134, to which Defendants Sterling Naki and Joshua Omoso have filed joinders, ECF Nos. 141, 142, as follows:

1) Counts 1-3 of the Second Amended Complaint are DISMISSED WITH PREJUDICE.

2) The Court declines to exercise supplemental jurisdiction over Count 4 of the Second Amended Complaint (asserting state-law negligence claims) and accordingly Count 4 is DISMISSED WITHOUT PREJUDICE, and Plaintiff may re-file this claim in Hawaii state court.

1

## PROCEDURAL BACKGROUND

On March 30, 2017, Plaintiff Hyun Ju Park ("Plaintiff") filed a Complaint against the following entities and individuals: (1) City and County of Honolulu ("Honolulu"); (2) Honolulu Police Department ("HPD") officer Anson Kimura ("Kimura")[1] in his individual and official capacity; (3) HPD officer Sterling Naki ("Defendant Naki") in his individual and official capacity; (4) HPD officer Joshua Omoso ("Defendant Omoso") in his individual and official capacity (collectively with Kimura and Defendant Naki, the "individual officers"); and (5) John and/or Jane Does 1-10 and Doe Associations 1-5 (collectively with the John and Jane Does, the "Doe Defendants").  Compl. ¶¶ 8-11, ECF No. 1.

The Complaint asserted six causes of action.  Counts 1 through 3, arising under 42 U.S.C. § 1983, alleged that Defendants violated Plaintiff's rights under the Fourth and Fourteenth Amendments.  Id. ¶¶ 31-43.  Counts 4 through 6 alleged claims of assault and battery; intentional infliction of emotional distress ("IIED"); and negligence.  Id. ¶¶ 44-51.

On May 11, 2017, Defendant Honolulu filed a Motion to Dismiss Complaint Filed April 20, 2017 Pursuant to FRCP

---

[1] On November 16, 2017, the parties stipulated to dismiss all claims against Kimura, who fired the bullet that injured Plaintiff, with prejudice, and he is no longer a defendant in this case.  ECF No. 97.

12(b)(6).  ECF No. 14.  Dongbu Insurance Co. ("Intervenor Plaintiff" or "Dongbu") filed a Motion to Intervene on June 2, 2017, to protect its subrogation rights as the lien holder for the worker's compensation benefits it provided Plaintiff and to assert claims against Defendants.  ECF No. 25.  On August 31, 2017, Magistrate Judge Kevin Chang granted the Motion to Intervene.  ECF Nos. 52, 68.

On September 11, 2017, both Plaintiff and Intervenor Plaintiff filed Oppositions to Defendant Honolulu's Motion to Dismiss, ECF Nos. 60, 62, to which Defendant Honolulu later filed replies, ECF Nos. 71, 72.

On October 3, 2017, the Court entered an Order Granting in Part and Denying in Part Defendant City and County of Honolulu's Motion to Dismiss Complaint ("October 3, 2017 Order").  ECF No. 79.  In the October 3, 2017 Order, the Court:

1) Granted the Motion to Dismiss Plaintiff's official capacity claims against Defendants Kimura, Naki, and Omoso.  The Court construed these claims against the City and County of Honolulu and dismissed them against the officers in their official capacity with prejudice;

2) Denied the Motion to Dismiss as to the Doe Defendants; and

3) Granted the Motion to Dismiss as to Counts 1-3

3

and 6 against Defendant City and County of
Honolulu, and dismissed these counts without
prejudice.

On November 2, 2017, Plaintiff filed her First Amended
Complaint ("FAC"). ECF No. 90. The FAC alleged the same claims
against the same Defendants as the Complaint, except the FAC's
negligence claim in Count 6 added a negligent training and/or
supervision theory.

On November 22, 2017, Defendant Honolulu filed a
Motion to Dismiss the First Amended Complaint. ECF No. 98. On
December 6, 2017, Defendants Omoso and Naki filed joinders to
Defendant Honolulu's Motion to Dismiss. ECF Nos. 103, 104. On
January 12, 2018, Plaintiff filed an Opposition to Defendant's
Motion. ECF No. 120. That same date, Plaintiff-Intervenor
Dongbu filed a Joinder to Plaintiff's Opposition. ECF No. 122.
On January 22, 2018, Defendant Honolulu filed a Reply to
Plaintiff's Opposition. ECF No. 124.[2]

---

[2] On December 22, 2017, Dongbu filed a Complaint in Intervention.
ECF No. 110. On January 11, 2018, Defendant Honolulu filed a
Motion to Dismiss Dongbu's Complaint. ECF No. 118. Defendants
Naki and Omoso filed Joinders to Defendant Honolulu's Motion.
ECF Nos. 127, 128. The Court scheduled a hearing on Defendant
Honolulu's motion to dismiss for March 19, 2018, but on February
20, 2018, Dongbu notified the Court that Defendant Honolulu
agreed to stay or continue the hearing since the complaint in
intervention would require amendment in light of the February
12, 2018 Order's dismissal of Plaintiff's FAC. See ECF No. 133.
Thus, by minute order entered February 21, 2018, the Court
administratively withdrew Defendant Honolulu's motion and gave

4

On February 12, 2018, the Court issued an Order
Granting Defendant City and County of Honolulu's Motion to
Dismiss the First Amended Complaint ("February 12, 2018 Order").
ECF No. 132.  The February 12, 2018 Order:

> 1) Granted the Motion to Dismiss as to Counts 1-3
>    and 6 against Defendant City and County of
>    Honolulu and Defendants Naki and Omoso, and
>    dismissed those claims without prejudice; and
>
> 2) Granted the Motion to Dismiss as to Plaintiff's
>    official capacity claims against Defendants Naki

---

Dongbu thirty days from the filing of Plaintiff's Second Amended
Complaint to file an amended complaint in intervention.  Id.

After Plaintiff filed her Second Amended Complaint on March 13,
2018, ECF No. 133, Defendant Honolulu moved to dismiss it, ECF
No. 138.  On April 9, 2018, Dongbu requested by email an
extension of time to file its amended complaint in intervention
until after the Court ruled on Defendant Honolulu's motion to
dismiss the Second Amended Complaint.  ECF No. 156.  Dongbu's
email stated:  "We believe that if Plaintiff's second amended
complaint is ultimately dismissed by the federal court, Dongbu
will voluntarily withdraw/dismiss its intervening complaint,
since we will likely follow the Plaintiff to state court.
Alternatively, if the second amended complaint is allowed by the
court, we would still need to amend our complaint in
intervention, for consistency."  Id.

By minute order entered April 10, 2018, the Court granted
Dongbu's request.  ECF No. 140.  The Court stated that it would
specify the time in which Dongbu may file any amended complaint
in intervention in its order ruling on the motion to dismiss the
Second Amended Complaint.  Id.  However, because the Court now
dismisses Plaintiff's Second Amended Complaint without prejudice
to Plaintiff refiling her state-law claims in state court,
Dongbu's request to file an amended complaint in intervention is
moot.

5

and Omoso.

See id. at 1-2.[3]

On March 13, 2018, Plaintiff filed a Second Amended Complaint ("SAC"). ECF 134. The SAC alleges four causes of action against the same Defendants as the FAC, but Defendants Naki and Omoso are named only in their individual capacities. Id. ¶ 8. On April 3, 2018, Defendant Honolulu filed a Motion to Dismiss the SAC, ECF No. 138, and a supporting memorandum ("MTD"), ECF No. 138-2. On April 12, 2018, Defendants Naki and Omoso filed substantive joinders to Defendant Honolulu's Motion to Dismiss the SAC. ECF Nos. 141, 142. On July 16, 2018, Plaintiff filed an Opposition to Defendant's Motion ("Opp."). ECF No. 149. On July 16, 2018, Plaintiff-Intervenor Dongbu filed a substantive joinder to Plaintiff's Opposition. ECF No. 150. On July 23, 2018, Defendant Honolulu filed a Reply to Plaintiff's Opposition ("Reply"). ECF No. 151. The Court held a hearing on Defendant Honolulu's Motion to Dismiss the SAC on August 6, 2018.

**FACTUAL BACKGROUND**

At approximately 1:45 a.m. on April 3, 2015, Plaintiff

---

[3] As noted above, on November 16, 2017, all of the claims against Kimura were dismissed pursuant to a settlement agreement. ECF No. 97. Counts 4 and 5 of the First Amended Complaint were against Kimura only, and the February 12, 2018 Order thus explained that these counts no longer remained in this case. February 12, 2018 Order at 35.

was performing her duties as a bartender and manager at the Kings Sports Bar ("Kings") in Honolulu, Hawaii. SAC ¶ 10. Kimura and Defendants Naki and Omoso had been consuming alcoholic beverages and socializing at Kings for approximately two hours. Id. ¶¶ 11, 14. During this time, Kimura consumed approximately seven 12-ounce bottles of Coors Light beer. Id. ¶ 15.

While "mental[ly] and/or physical[ly] impaired due to his consumption of alcohol," Kimura brandished his HPD supplemental firearm for the purpose of reloading it. Id. ¶¶ 21-22. One bullet discharged from Kimura's firearm and struck Plaintiff. Id. at 27.

Defendants Naki and Omoso observed Kimura mishandling his firearm prior to its discharge but did not intervene.[4] See id. ¶¶ 25-26. Pursuant to HPD Policy Number 2.21, entitled "Standards of Conduct," effective on the date of the incident, Defendants Naki and Omoso were required to take action when they observed Kimura's reckless and dangerous handling of his

---

[4] Plaintiff and others present at Kings were aware that Kimura and Defendants Naki and Omoso, who were regular customers at Kings, were HPD officers. Id. ¶ 17. Nevertheless, on previous visits to Kings, Kimura: (1) consumed alcohol and brandished a firearm against Plaintiff; and (2) stabbed a knife into a wooden table due to his anger with Plaintiff. Id. ¶ 19. Plaintiff alleges that Defendants Naki and Omoso "and/or DOE DEFENDANTS deliberately failed to report Kimura's prior misconduct . . . due to their willful adherence to a known 'brotherhood' culture of silence among HPD officers . . . ." Id. ¶ 20.

firearm. Id. ¶ 43. Nevertheless, and despite being trained in accordance with HPD Policy Number 2.21, Defendants Naki and Omoso "deliberately failed to perform their duties." Id. ¶¶ 44-45

Kimura was carrying his HPD supplemental firearm at the time of the incident "in furtherance of HPD Policy Number 2.38." Id. ¶ 34. Pursuant to HPD Policy Number 2.38, effective on the date of the incident and entitled "Uniforms, Equipment, and Firearms," police officers are required to possess their HPD issued firearm at all times but are prohibited from such possession when an officer's "physical and/or mental processes are impaired because of consumption or use of alcohol." Id. ¶ 34. Kimura was trained in accordance with HPD Policy Number 2.38. Id. ¶ 36. His attempt to reload his HPD supplemental firearm while impaired at Kings "was performed in accordance with his official training and duties as an HPD officer . . . [and] Kimura knew it was necessary that his firearm be loaded to achieve the intended purpose of HPD Policy Number 2.38," Id. ¶ 37.

The SAC alleges that HPD Policy Number 2.38 was modified around January 6, 2016, after the date of the incident, to prohibit officers from physically handling HPD issued firearms while consuming alcohol or any other substance likely to impair their physical or mental processes. Id. ¶ 42. Policy

Number 2.38, in the form effective on the date of the incident, was allegedly deficient because it permitted officers to possess firearms while consuming alcohol until the point of mental or physical impairment.  Id. ¶ 39.  Policy Number 2.38 allegedly should have contained an express prohibition on the possession of a firearm while consuming any amount of alcohol.  Id.  Other alleged deficiencies in Policy Number 2.38 include its lack of guidance as to: (1) how an officer should determine whether he or she is "impaired"; (2) how to prevent firearm mismanagement if an officer is "about to become impaired"; and (3) how to prevent an armed and impaired officer from injuring another person.  Id. ¶ 35.

    In addition, the SAC alleges that there was a "brotherhood" culture of silence at the HPD pursuant to which officers abstained from reporting their fellow officers' misconduct.  Id. ¶¶ 46-47.  This "brotherhood" culture of silence was a de facto policy of the HPD, evidenced during the April 3, 2015 incident at Kings when officers failed to "report and/or take appropriate action against Kimura."  Id. ¶¶ 46-47, 51.  The SAC alleges that this "brotherhood" culture was further shown during prior incidents in which the HPD concealed and condoned officer misconduct.  Id. ¶¶ 50, 52.

### STANDARD

    Federal Rule of Civil Procedure 12(b)(6) authorizes

the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Court may dismiss a complaint either because it lacks a cognizable legal theory or because it lacks sufficient factual allegations to support a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).

In resolving a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations as true. Sateriale v. R.J. Reynolds Tobacco Co., 697 F.3d 777, 783 (9th Cir. 2012). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Id. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557).

When the Court dismisses a complaint pursuant to Rule
12(b)(6) it should grant leave to amend unless the pleading
cannot be cured by new factual allegations.  OSU Student All. v.
Ray, 699 F.3d 1053, 1079 (9th Cir. 2012).

## DISCUSSION

### I.    Section 1983 Claims (Counts 1-3)

Section 1983 provides relief against "[e]very person
who, under color of any statute, ordinance, regulation, custom,
or usage, of any State . . . causes  . . . any citizen of the
United States . . . the deprivation of any rights, privileges,
or immunities secured by the Constitution."  42 U.S.C. § 1983.
Parties can seek relief under § 1983 against persons acting
under the color of state law.  West v. Atkins, 487 U.S. 42, 48
(1988).  "Persons" covers "state and local officials sued in
their individual capacities, private individuals and entities
which acted under color of state law, and local governmental
entities."  Vance v. Cnty. of Santa Clara, 928 F. Supp. 993,
995-96 (N.D. Cal. 1996).  For an official capacity suit,
municipalities and their agents must cause the violation of a
federal constitutional or statutory right through a policy or
custom.  Monell, 436 U.S. at 694.

To establish a Section 1983 claim for municipal
liability, the plaintiff must show: "(1) that [she] possessed a
constitutional right of which she was deprived; (2) that the

municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992) (internal quotation marks omitted).

Defendant Honolulu argues that the SAC does not plausibly allege that Defendants acted under color of state law or establish any of these four requirements. The Court discusses each of these arguments in turn.

### a. The SAC Does Not Plausibly Allege that Defendants Acted Under Color of State Law

Defendant Honolulu argues that the Court should dismiss the SAC because Defendants did not act under the color of state law. MTD at 5-10. The Ninth Circuit has held that there are "three critical requirements that must be satisfied" for conduct to be considered state action: (1) the acts complained of must have been "performed while the officer is acting, purporting, or pretending to act in the performance of his or her official duties"; (2) the "pretense of acting in the performance of his duties must have had the purpose and effect of influencing the behavior of others"; and (3) the acts complained of must be "related in some meaningful way either to the officer's governmental status or to the performance of his duties." Anderson v. Warner, 451 F.3d 1063, 1068-69 (9th Cir.

2006) (internal quotation marks and citation omitted); see also

Silva v. City & Cnty. of Honolulu, Civ. No. 11-00561 LEK-RLP,

2013 WL 2420902, at *12 (D. Haw. May 31, 2013).  The Court finds

that, like the Complaint and the FAC before it, the SAC fails to

plausibly allege that the individual officers acted under color

of state law.[5]

### i.   The Acts Complained of Were Not Performed While the Officers Were Acting, Purporting, or Pretending to Act in the Performance of Their Official Duties

A police officer's acts can fairly be said to be under

color of state law only where they "were in some way related 'to

the performance of his official duties.'"  Van Ort v. Estate of

Stanewich, 92 F.3d 831, 838 (9th Cir. 1996) (quoting Martinez v.

Colon, 54 F.3d 980, 986 (1st Cir. 1995)).  Accordingly, the

Ninth Circuit has explained that "an officer who is pursuing his

own goals and [i]s not in any way subject to control by [his

public employer] . . . does not act under color of law, unless

---

[5] Additionally, the Court finds that the SAC does not adequately allege that any municipal policy, custom, or practice at issue "in and of itself violated [Plaintiff's] constitutional rights . . . ."  See City of Oklahoma City v. Tuttle, 471 U.S. 808, 822 (1985) ("The 'policy' of the New York City Department of Social Services that was challenged in Monell . . . . in and of itself violated the constitutional rights of pregnant employees . . . . but the 'policy' that respondent seeks to rely upon is far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell.").

he purport[s] or pretend[s] to do so." <u>Huffman v. Cnty. of Los Angeles</u>, 147 F.3d 1054, 1058 (9th Cir. 1998) (citation and internal quotation marks omitted).  Acts that are "purely private" and "not furthered by any actual or purported state authority[,] are not acts under color of state law." <u>Barna v. City of Perth Amboy</u>, 42 F.3d 809, 816 (3d Cir. 1994) (holding that "unauthorized use of a police-issued nightstick is simply not enough to color [a] clearly personal family dispute with the imprimatur of state authority"); <u>see also</u> <u>Martinez</u>, 54 F.3d at 988 (1st Cir. 1995) ("[W]hile a police officer's use of a state-issue[d] weapon in the [on-duty] pursuit of private activities will have furthered the § 1983 violation in a literal sense, a court needs additional indicia of state authority to conclude that the officer acted under color of state law." (citation omitted)).

Here, the SAC fails to allege that the individual officers were acting, purporting, or pretending to act in the performance of their official duties.  The act that forms the crux of Plaintiff's allegations—Kimura's off-duty discharge of his personal firearm while drinking and socializing at Kings—is a "purely private" act.  Although the SAC no longer explicitly alleges that Kimura was "off-duty" at the time of the incident, it does allege that he was handling his "personal firearm that HPD had authorized [him] to carry for official use wh[en] 'off-

duty.'" SAC ¶¶ 13-14. Further, the SAC does not allege, for

example, that Kimura identified himself as a police officer,

wore his uniform, or carried official identification while at

Kings. E.g., Hechavarria v. City & Cnty. of San Francisco, 463

F. App'x 632, 633 (9th Cir. 2011) (finding that individual's

conduct was not under color of state law where he "did not

represent himself as a City employee; rather, he was off-duty,

wearing street clothes, and driving in his own personal

vehicle."); see also Pete v. Olsen, No. CV-09-54-EFS, 2010 WL

996408, at *3 (E.D. Wash. Mar. 15, 2010) (holding that off-duty

police officer not acting under color of state law where he shot

a bar patron because, inter alia, officer was "off duty and not

in uniform . . . . [and] never identified himself as a police

officer or gave any commands other than "stop[.]").

The SAC alleges that Plaintiff and others at Kings knew

that Kimura was a police officer, but generally recognizing an

off-duty police officer as an officer does not convert his

conduct into action taken under color of state law. E.g., Van

Ort, 92 F.3d at 839 (reasoning that plaintiffs' recognition of

defendant as an off-duty police officer "does not alone

transform private acts into acts under color of state law"); Roe

v. Humke, 128 F.3d 1213, 1217 (8th Cir. 1997) (explaining that

knowledge of an off-duty officer's status as an officer is

insufficient to convert actions taken in the pursuit of private

interests into actions taken under color of state law); Lyons v. Adams, 257 F. Supp. 2d 1125, 1132-33 (N.D. Ill. 2003) (holding that there was no evidence that the incident in question involved the officers' performance of their official duties because, inter alia, they did not wear police uniforms, identify themselves as police officers, or display their badges).

Neither does HPD authorizing Kimura to carry a firearm under Policy Number 2.38, nor Kimura's alleged attempt to re-load his weapon at the time of the incident (in violation of Policy Number 2.38), id. ¶ 21; Opp. at 12, transform his private act into one taken under the color of state law. Kimura was off-duty and drinking at Kings "in a state of mental and/or physical impairment" when he improperly attempted to reload his firearm, id. ¶ 21. Under these circumstances, Kimura's conduct was not an act in the performance of his official duties. Naffe v. Frey, 789 F.3d 1030, 1036 (9th Cir. 2015) ("[W]hen the state employee is off duty, whether he or she is acting under color of state law turns on the nature and circumstances of the [employee's] . . . conduct and the relationship of that conduct to the performance of his official duties." (citation and internal quotation marks omitted)); Reply at 4.

The same is true as to Defendants Naki and Omoso. The SAC alleges that Defendants Naki and Omoso were drinking alcohol with Kimura at Kings. Id. ¶ 11. While the two officers had

"openly and verbally stated on prior occasions that they were
HPD officers," id. at 17, the SAC does not plausibly allege
that, at the time of the incident, they were acting, purporting,
or pretending to act in performance of their official duties.
As with Kimura, the SAC contains no allegations that Defendants
Naki and Omoso were in uniform, carried official identification,
or identified themselves as a member of law enforcement prior to
or during the incident.  See e.g., Hechavarria, 463 F. App'x at
633; Silva, 2013 WL 2420902, at *12.

Moreover, the SAC alleges in conclusory fashion that
Defendants Naki and Omoso "were effectively on-duty pursuant to
HPD Policy Number 2.21" when they observed Kimura recklessly and
dangerously handling of his firearm.[6]  SAC ¶ 60; see also Opp.
at 12-13.  But Defendants Naki and Omoso allegedly violated this
policy by failing to prevent Kimura from discharging his

_____

[6] The Court notes that HPD Policy Number 2.21 states that HPD
officers are always "subject" to duty, not that they are always
"on duty."  Even where an officer is on-duty, however, his
conduct is not automatically performed under color of state law.
Anderson, 451 F.3d at 1068 ("[W]hether a[n] . . . officer is
acting under color of state law turns on the nature and
circumstances of the officer's conduct and the relationship of
that conduct to the performance of his official duties."
(quoting Martinez, 54 F.3d at 986)).  For example, in Martinez,
the First Circuit held that a police officer's unintentional
shooting of another officer was not under color of state law
because the on-duty officer was engaged in a "personal frolic:
tormenting an acquaintance. . . . Though on duty and in uniform,
[the officer]'s status as a police officer simply did not enter
into his benighted harassment of his fellow officer."  54 F.3d
at 987; see also Reply at 7 & n.2.

firearm.  E.g., SAC ¶¶ 60, 61.  Defendants Naki and Omoso's

alleged conduct—failing to follow official policy while off-

duty, drinking at a bar at 1:45 a.m., wearing street clothes,

and not identifying themselves as police officers—is not

plausibly an act taken under color of state law.[7]  See February

12, 2018 Order at 13-14.

### ii. The Officers Did Not Act with the Purpose and Effect of Influencing the Behavior of Others

The SAC again fails to plausibly allege that either

Kimura or Defendants Naki and Omoso acted with the purpose and

effect of influencing others.  First, Kimura is alleged to have

been drinking and socializing at Kings with Defendants Naki and

Omoso when he recklessly and dangerously handled his personal

firearm.  SAC ¶¶ 14, 27.  The SAC does not allege that Kimura's

discharge of his firearm was purposeful.  Id. ¶¶ 21, 24, 27.

---

[7] Plaintiff cites McCollum v. Mayfield, 130 F. Supp. 112 (N.D. Cal. 1955) for the proposition that Defendants Naki and Omoso's failure to prevent Kimura's conduct at Kings was an omission that occurred in the performance of their official duties.  Opp. at 12-13.  The Court finds McCollum distinguishable.  In that out-of-district case from the 1950s, the plaintiff "allege[d] that while in the custody of defendants awaiting trial, he was forced to perform labor in the County Jail and suffered personal injuries of a serious nature; that defendants refused him medical care and placed him in a vermin infested cell; and that such conduct and omissions caused him to become permanently paralyzed and disabled."  McCollum, 130 F. Supp. 112 at 113. Defendants Naki and Omoso's alleged failure to intervene in Kimura's reckless conduct while they were off-duty and drinking at a bar is not analogous to the McCollum defendants' refusal to provide medical care made necessary after they forced the plaintiff to perform hard labor while in custody.

Second, the only allegation regarding Defendants Naki and Omoso's conduct is that they failed to act despite being duty-bound to prevent Kimura's conduct. E.g., id. ¶¶ 26, 27, 60, 61. The SAC is silent as to any intentional act Defendants Naki and Omoso took with the purpose and effect of influencing others.

Despite this context, Plaintiff contends that the individual officers' acted under color of state law because Plaintiff knew they were police officers but allegedly "remained silent and continued to perform her duties . . . due to her fear and awe of" their status as law enforcement officers. Id. ¶ 23. The Court rejected this same allegation in the February 12, 2018 Order. In that Order, the Court explained that "[t]he mere fact that [Plaintiff] knew that [her] attackers were police officers . . . does not mean that those officers acted under color of state law." February 12, 2018 Order at 14-15 (second alteration in original) (quoting Lyons v. Adams, 257 F. Supp. 2d 1125, 1132 N.D. Ill. 2003)); see also Van Ort, 92 F.3d at 839 ("The [Plaintiff's] argument rests largely upon [the fact that] that he recognized [the law enforcement officer] as a police officer, and the conjecture that this recognition somehow rendered his acts under color of state law. . . . however, [merely recognizing somebody as an police officer] would not make the attack under color of law."). The SAC adds no non-conclusory factual allegations to alter the Court's prior analysis. See

Reply at 5.

The SAC similarly alleges that "Kimura, NAKI, and OMOSO regularly flaunted their status as HPD officers with the affirmative purpose and effect of influencing others." SAC ¶ 18. This allegation is nothing more than a thinly veiled legal conclusion. As the Supreme Court has explained, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not entitled to a presumption of truth. Iqbal, 556 U.S. at 678. Given these deficiencies, Plaintiff has failed to plausibly allege that the individual officers acted with the purpose and effect of influencing others.

### iii. The Officers' Conduct Was Not Related in a "Meaningful" Way to Their Governmental Status or the Performance of Their Duties

The SAC does not adequately allege that Kimura or Defendants Naki and Omoso's conduct was related in some meaningful way to their governmental status or the performance of their duties. The Court previously stated that "the only relationship between Kimura's actions and his official duties was that he was carrying his unloaded HPD issued firearm and was attempting to reload it when the bullet fired. This is insufficient on its own to plausibly allege that Kimura was acting under color of state law." February 12, 2018 Order at 15 (citing cases). The SAC does not contain any new factual

allegations that compel a different conclusion.  Further,

Defendants Naki and Omoso's alleged failure to prevent Kimura

from discharging his firearm at Kings is private conduct that

bears no meaningful relationship to their law enforcement status

or official duties.

Perhaps recognizing that she has alleged purely

private conduct, Plaintiff also asserts that Kimura and

Defendants Naki and Omoso "established a special relationship

between [her] and themselves by deliberately and affirmatively

flaunting their status as law enforcement officers" at Kings.

SAC ¶ 62.  Because of this special relationship, Plaintiff

alleges, the individual officers had "a duty to protect" her.

Id.  Plaintiff appears to be attempting to fit this case into

one of the limited exceptions the Ninth Circuit has recognized

under which municipal liability may attach based on a

government's failure to protect a claimant from a private

individual.

However, the Court has previously addressed

Plaintiff's "duty to protect" theory and found it misplaced in

this case.  As the February 12, 2018 Order explained:

> In Van Ort v. Estate of Stanewich, 92 F.3d
> 831 (9th Cir. 1996), the Ninth Circuit
> recognized that "[o]nly under highly limited
> circumstances does the government have a
> duty to protect individuals from
> deprivations of constitutional rights by
> private individuals."  Id. at 836.  In such

> cases, government liability can only be
> found if there was a special relationship
> between the individual and the state actor,
> giving rise to a duty. Id. (citing DeShaney
> v. Winnebago Cy. Dep't of Social Serv., 489
> U.S. 189, 196-200 (1989)); Gazette v. City
> of Pontiac, 41 F.3d 1061, 1065 (6th Cir.
> 1994)). Such special relationships arise
> from affirmative government acts, "like
> incarceration of criminals and
> institutionalization of the mentally ill."
> Van Ort, 92 F.3d at 836 (citing DeShaney,
> 489 U.S. at 198-200). Here, the Court finds
> that no such relationship existed between
> Defendant Honolulu and Plaintiff to warrant
> such a duty.

February 12, 2018 Order at 11 n.3. This analysis remains

applicable to the SAC's "duty to protect" allegations, and

Plaintiff's conclusory use of labels like "special relationship"

does not "nudge[] [her] claims across the line from conceivable

to plausible." Twombly, 550 U.S. at 570; see MTD at 10 n.8.

As with the Complaint and the FAC before it, the SAC

fails to adequately allege that the individual officers acted

under the color of state law. Consequently, the Court dismisses

Counts 1, 2, and 3 with prejudice.

### b. The SAC Does Not Plausibly Allege that Plaintiff Possessed a Federal Constitutional or Statutory Right of Which She was Deprived

Even if the SAC plausibly alleged that the individual

officers acted under color of state law, Plaintiff's Monell

claims would fail for the reasons set forth below.

### i.    Fourth Amendment Violation

Plaintiff's <u>Monell</u> claims predicated upon alleged Fourth Amendment violations are not plausible because Plaintiff was never "seized."  <u>See</u> MTD at 11.  As the Court discussed in its October 3, 2017 Order and February 12, 2018 Order, a Fourth Amendment seizure does not occur "whenever there is a governmentally caused termination of an individual's freedom of movement . . . nor even whenever there is a governmentally caused and governmentally <u>desired</u> termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement <u>through means intentionally applied</u>."[8]  <u>Brower v. Cnty. of Inyo</u>, 489 U.S. 593, 596-97 (1989) (emphasis in original); <u>see also</u> February 12, 2018 Order at 17.  In other words, "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control."  <u>Brower</u>, 489 U.S at 596.  Although the person or object of the detention or taking can be unintended, "the detention or taking itself must be willful."  <u>Id.</u>

The SAC does not allege an intentional seizure.  It

---

[8] Plaintiff "acknowledges" this established law but nevertheless repeats her contention that "reckless conduct may serve as a basis for an unconstitutional seizure in violation of the Fourth Amendment."  Opp. at 17 n. 1; <u>see also</u> Reply at 6.  The Court rejected this argument in both the October 3, 2017 Order and February 12, 2018 Order, <u>e.g.</u>, February 12, 2018 Order at 18 n.4, and finds no reason to depart from the law of the case here.

instead alleges that Kimura "recklessly and dangerously handle[d] his firearm without just cause until one bullet was discharged, striking Plaintiff." SAC ¶ 27. Nothing in the SAC indicates that Kimura discharged his weapon intentionally or intended the bullet to strike Plaintiff. As the Court has previously explained, allegations of recklessness do not plausibly allege a seizure under the Fourth Amendment. E.g., February 12, 2018 Order at 17. The SAC, moreover, does not allege that Defendants Naki and Omoso took any intentional action to limit Plaintiff's freedom of movement. Quite the opposite, the SAC alleges that Defendants Naki and Omoso took no action to prevent Kimura's reckless and dangerous handling of his firearm. SAC ¶ 26.

The SAC also contains no new factual allegations establishing that governmental action caused Plaintiff's freedom of movement to be terminated. Kimura and Defendants Naki and Omoso's conduct, where alleged, was in their capacity as private citizens. See Van Ort, 92 F.3d at 835-37 ("Because Stanewich acted as a private citizen, the Van Orts had no constitutional right to be free from his deprivations of their constitutional rights."). Since a governmentally caused termination of Plaintiff's freedom of movement is lacking, Plaintiff's Monell claims predicated upon an alleged Fourth Amendment violation fails.

## ii. Fourteenth Amendment Violation

Similarly, the SAC does not plausibly allege a <u>Monell</u> claim predicated on a Fourteenth Amendment violation. The Due Process Clause of the Fourteenth Amendment protects the right to be secure in one's person. <u>McRorie v. Shimoda</u>, 795 F.2d 780, 785 (9th Cir. 1986). The Fourteenth Amendment thus protects against governmental interference with one's bodily integrity. <u>P.B. v. Koch</u>, 96 F.3d 1298, 1303 (9th Cir. 1996). A substantive due process claim under the Fourteenth Amendment turns on whether the challenged governmental action is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 847 n.8 (1998). What shocks the conscience under certain circumstances may not shock the conscience under others. <u>See</u> <u>id.</u> at 850.

As the Court explained in its February 12, 2018 Order:

> Historically, this guarantee of due process has been applied to <u>deliberate</u> decisions of government officials to deprive a person of life, liberty, or property." <u>Daniels v. Williams</u>, 474 U.S. 327, 331-32 (1986) (emphasis in original). The Due Process Clause is not implicated by the lack of due care of an official causing unintended loss or injury to life, liberty, or property. <u>Id.</u> at 332-33. "The Fourteenth Amendment is not a font of tort law to be superimposed upon whatever systems may already be administered by the states." <u>Lewis</u>, 523

> U.S. at 848 (internal quotation marks and
> citation omitted).[9] Rather, "it is . . .
> behavior at the other end of the culpability
> spectrum that would most probably support a
> substantive due process claim; conduct
> intended to injure in some way unjustifiable
> by any government interest is the sort of
> official action most likely to rise to a
> constitutional violation." Id. at 849.

ECF No. 132 at 20 (emphasis in original).

Here, the SAC's allegations are insufficient to allege

a plausible violation of substantive due process under the

Fourteenth Amendment. The SAC alleges no intentional

governmental action meant to interfere with Plaintiff's bodily

integrity. Reply at 6-7. First, Kimura did not intentionally

interfere with Plaintiff's bodily integrity when, while off-duty

in a state of mental impairment, he discharged one bullet after

"recklessly and dangerously handl[ing] his firearm . . . ." SAC

¶ 27. Defendants Naki and Omoso's alleged failure to act to

prevent Kimura's unintentional conduct is not the equivalent of

governmental interference with Plaintiff's bodily integrity.

E.g., February 12, 2018 Order at 21-22. And Plaintiff fails to

---

[9] In Lewis, the Supreme Court addressed the issue of whether a
police officer violates the Fourteenth Amendment's substantive
due process clause by causing death through deliberate or
reckless indifference to life in a high-speed automobile chase
aimed at apprehending a suspected offender. 523 U.S. at 836.
The Supreme Court held that such conduct did not "give rise to
liability under the Fourteenth Amendment, redressible by an
action under § 1983." Id. at 854. In that case, the complaint
alleged that the police officers acted, inter alia, recklessly
and carelessly. Id.

plead any non-conclusory allegations indicating that Defendants

Naki and Omoso deliberately meant to deprive her of her life,

liberty, or property.  Under these circumstances, the Court does

not find that any of Defendants' the alleged conduct "shocks the

conscience."

Second, for the reasons discussed above, the Court

finds that no constitutional violation occurred because there

was no governmental interference in Plaintiff's bodily

movements.  Accordingly, Plaintiff has not plausibly alleged a

Monell claim predicated on a Fourteenth Amendment violation.

### c. The SAC Does Not Plausibly Allege that the City and County of Honolulu Had a Policy, Practice, or Custom that Amounted to Deliberate Indifference to Plaintiff's Constitutional Rights and was the Moving Force Behind the Constitutional Violation

The SAC also fails to plausibly allege a Monell claim

based on Defendant Honolulu's policies, practices, or customs.

Under Section 1983, municipalities are responsible for the

unconstitutional conduct of their officials only where the

conduct was caused by a municipal policy, practice, or custom.

Menotti v. City of Seattle, 409 F.3d 1113, 1147 (9th Cir. 2005).

To establish a municipal policy, practice, or custom, a

plaintiff may allege that a municipal employee committed an

alleged constitutional violation in accordance with a formal

government policy or a longstanding practice or custom which

constitutes the standard operating procedure of the local

27

municipality.  Hooper v. City of Pasco, 241 F.3d 1067, 1083 (9th Cir. 2001) (quoting Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992)).  A policy can be one of action or inaction, such as a failure to train employees when such omissions amount to the government's policy.  Long v. Cnty. of Los Angeles, 442 F.3d 1178, 1185-86 (9th Cir. 2006).

Moreover, a plaintiff is required to plead sufficient facts to show that the policy, practice, or custom amounted to "deliberate indifference" by the municipality to the rights of those with whom it comes into contact.  Establishing deliberate indifference is a high bar, "requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997).

Finally, a plaintiff must plead that the policy, practice, or custom was the moving force behind the constitutional violation.  A policy, practice, or custom will be the moving force behind the constitutional deprivation only where the deficiency the plaintiff alleges is closely related to her injury.  Long, 442 F.3d at 1190.  Thus, the plaintiff must establish that the injury would not have occurred if proper policies were in place.  Id.  The SAC pleads four theories predicated on Defendant Honolulu's policies, practices, or customs, which the Court discusses below.

The SAC alleges that HPD Policy Number 2.38 "required Kimura to possess a pistol at all times, but prohibited such possession when an officer's 'physical and/or mental processes are impaired because of consumption or use of alcohol . . . .'" SAC ¶ 34 (emphasis in original). The Court finds that Plaintiff has plausibly alleged a policy, practice, or custom based on HPD Policy Number 2.38, which was entitled "Uniforms, Equipment, and Firearms" and was effective on the date of the incident.

Plaintiff has failed, however, to plausibly allege that HPD Policy Number 2.38 amounted to deliberate indifference to her constitutional rights. Plaintiff seems to argue that HPD Policy Number 2.38 amounted to deliberate indifference because it provided no guidance as to:

> (i) how an armed officer should determine
> that he or she is 'impaired,' (ii) what
> course of action an armed officer should
> take to prevent firearm mismanagement upon
> recognizing that he or she has or is about
> to become impaired, and (iii) what course of
> action another officer should take to
> prevent an armed and impaired officer from
> causing injury to another person.

Id. ¶ 35; see also Opp. at 18-20. Plaintiff alleges that Kimura acted pursuant to HPD Policy Number 2.38 because he "did not believe himself to be mentally and/or physically impaired due to alcohol consumption," and he "knew it was necessary that his firearm be loaded to achieve the intended purpose of" the

policy.  SAC ¶ 37.  According to Plaintiff, HPD Policy Number 2.38 was defective because it "directed officers to possess firearms while consuming alcohol until the point of mental and/or physical impairment, rather than expressly prohibiting the possession of a firearm while consuming alcohol in any amount.  Id. ¶ 39.

However, HPD Policy Number 2.38 (as effective on the date of the incident) prohibited Kimura's conduct at Kings. Even if Kimura was subjectively acting to achieve the policy's purpose, his conduct objectively violated the policy.  That Defendant Honolulu later implemented a different policy governing the possession of firearms while consuming alcohol does not change that Kimura's conduct was barred under the prior version of the policy.[10]  Moreover, the policy did not, as Plaintiff alleges, direct off-duty officers to possess firearms while consuming alcohol until impaired.  Id. ¶ 39.  It flatly prohibited possession of a firearm when impaired, and the

---

[10] Plaintiff cites to various police departments' policies regulating off-duty officers' possession of firearms while consuming alcohol.  Opp. at 20 n.3.  In so doing, Plaintiff attempts to argue that HPD Policy Number 2.38, which was not as strict as these various policies at the time of the incident, constituted deliberate indifference to her constitutional rights.  Id.  However, the Court finds that these limited examples of departments changing their policies close to, or even after, the incident does not establish that Defendant Honolulu's policy was clearly deficient at the time of the incident.

alleged omissions in the policy that Plaintiff claims do not show that Defendant Honolulu "disregarded a known or obvious consequence" in a manner actionable under Section 1983. Brown, 520 U.S. at 410; see also February 12, 2018 Order at 24-25 n.6 (discussing Huffman and noting that its similarities to this case make it persuasive).

In addition, HPD Policy Number 2.38 was not the moving force behind the alleged constitutional violation. Monell, 436 U.S. at 694. Plaintiff alleges that the policy was the moving force because it "directed officer to possess firearms while consuming alcohol until the point of mental and/or physical impairment, rather than expressly prohibiting the possession of a firearm while consuming alcohol in any amount." SAC ¶ 39 (emphasis in original). The Court rejected these same allegations in the February 12, 2018 Order. February 12, 2018 Order at 25-26. As explained in that Order, Kimura consumed seven alcoholic beverages within two hours and became impaired before allegedly attempting to load his firearm to "achieve the intended purpose of HPD Policy Number 2.38." SAC ¶¶ 15, 37. Under these circumstances, and considering that Kimura was impaired at the time of the incident, HPD Policy Number 2.38 was not "closely related to [Plaintiff's] ultimate injury." Long 442 F.3d at 1190.

Accordingly, the Court finds that Plaintiff has not

adequately alleged that HPD Policy Number 2.38 amounted to
deliberate indifference and was the moving force behind any
violation of her constitutional rights.

### ii. HPD Policy Number 2.21

The SAC alleges that Defendants Naki and Omoso were
effectively on-duty pursuant to HPD Policy Number 2.21 when they
observed Kimura recklessly and dangerously handling his
firearm.[11]  SAC ¶ 43.  According to the SAC, Defendants Naki and
Omoso were required to take action under the policy upon
observing Kimura's conduct but "deliberately failed to perform
their duties."  Id. ¶¶ 44-45.  The Court finds that the SAC does
not adequately allege facts showing that HPD Policy Number 2.21
amounted to deliberate indifference, because the policy
allegedly required Defendants Naki and Omoso to intervene in the
incident and prevent Kimura's reckless conduct.  Id. ¶ 43.
Defendants Naki and Omoso's purported failure to intervene shows
possible deficient performance, not a deficient policy.

Similarly, HPD Policy Number 2.21 was not the moving
force behind any violation of Plaintiff's federal constitutional
or statutory rights.  The SAC alleges that Defendants Naki and
Omoso violated the policy when they deliberately failed to act,

---

[11] In her opposition brief, Plaintiff does not address whether
HPD Policy Number 2.21 constituted a policy amounting to
deliberate indifference to her constitutional rights and was the
moving force behind the alleged constitutional violation.

and that their inaction caused the alleged constitutional violation.  Said differently, Plaintiff does not allege that HPD Policy Number 2.21 allegedly caused the conduct about which she complains.

### iii. HPD's "Brotherhood" Culture of Silence

Plaintiff has plausibly alleged a policy, practice, or custom based on HPD's "brotherhood" culture of silence.  See Cook v. City of Fairfield, No. 215-CV-02339 KJM-KJN, 2017 WL 4269991, at *6 (E.D. Cal. Sept. 26, 2017).  The SAC alleges that a "'brotherhood' culture of silence was prevalent among officers at HPD, in which officers were known to abstain from reporting the misconduct of their fellow officers, resulting in Defendant [Honolulu]'s willful failure to adequately discover and investigate instances of officer misconduct."  SAC ¶ 46.

Through allegations that are nearly identical to those found deficient in the February 12, 2018 Order, the SAC further states that the actions taken by HPD members after the incident at Kings evidenced the "brotherhood" culture of silence and its effects.  Id. ¶ 49.  These actions include: (1) sequestering Kimura and Defendants Naki and Omoso from questioning during the investigation; (2) initially misclassifying the incident as a non-criminal matter; (3) failing to subject Kimura to a breathalyzer test; and (4) failing to ask basic investigative questions to determine the nature and circumstances leading to

33

Plaintiff's injury.  Id.  The SAC, like the FAC, further alleges that the "brotherhood" culture of silence was shown through prior incidents of HPD misconduct (by on-duty officers) in 2009-2010, 2012, and 2014, as well as other incidents at Kings involving Kimura.  Id. ¶¶ 19, 51-53.

The SAC does not, however, add any non-conclusory factual allegations showing that the "brotherhood" culture of silence amounted to deliberate indifference to Plaintiff's federal constitutional or statutory rights.  Those allegations the SAC does add about the "brotherhood" culture of silence remain vague and conclusory and therefore insufficient to survive a motion to dismiss.  See Iqbal, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions . . . Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

For example, the SAC alleges that, "[i]n failing to intervene and prevent Kimura from causing injury to Plaintiff, . . . [Defendants Naki and Omoso] knowingly and willfully adhered to HPD's "brotherhood" culture of silence with the purpose and effect of influencing the behavior of others present at Kings Sports Bar."  SAC ¶ 66.  The SAC further alleges that HPD "acted with deliberate indifference and under color of law by perpetuating the 'brotherhood' culture of silence that

encourages and emboldened" Kimura and Defendants Naki and Omoso

to "flaunt their status as law enforcement officers, and . . .

engage in and/or tolerate the reckless and dangerous handling of

a firearm by Kimura." Id. ¶ 67. Neither of these conclusory

allegations plausibly shows that the "brotherhood" culture of

silence itself amounted to deliberate indifference to

Plaintiff's constitutional rights.[12]

In addition, Plaintiff's allegations about the

"brotherhood" culture of silence fail to establish that it was

the moving force behind her constitutional injury. Plaintiff

alleges that the "brotherhood" culture of silence was the moving

force behind her injuries because her injuries would not have

occurred "had[:] (i) [Defendant Honolulu] established policies

to subvert the 'brotherhood' culture of silence by mandating the

---

[12] Plaintiff again cites to Laporta v. City of Chicago, 102 F.
Supp. 3d 1014 (N.D. Ill. 2015) to support the proposition that a
police department's alleged "code of silence" may constitute a
custom, policy, or practice that amounts to deliberate
indifference and was the moving force behind the constitutional
violation. Opp. at 23 n.7. In the February 12, 2018 Order,
however, the Court found Laporta distinguishable. February 12,
2018 Order at 30 n.12. The Court explained that the Laporta
plaintiff, unlike Plaintiff here, "alleged facts supporting a
connection between the City's policy of condoning officer
misconduct and the constitutional injury, including the fact
that fifteen complaints had been filed against the officer at
issue alleging excessive force and other misconduct." Id.
(citing Laporta, 102 F. Supp. 3d at 1021). The SAC does not
establish the connection between HPD's "brotherhood" culture of
silence and Plaintiff's constitutional injury found missing in
the FAC. Accordingly, the Court will not depart from the law of
the case here.

reporting of misconduct; and (ii) [Defendants Naki and Omoso]
reported Kimura's prior acts of firearm mishandling to HPD
administrators so that Kimura would be disciplined for his prior
firearm-related misconduct . . . ." Id. ¶ 68.  As an initial
matter, Plaintiff's allegations regarding these supposed
omissions remain conclusory.  See Iqbal, 556 U.S. at 678.  In
addition, Plaintiff's allegations focus on supposed omissions in
Defendant Honolulu's policies that permitted the "brotherhood"
culture of silence to persist, rather than plausibly alleging
that the culture itself was the moving force behind her
injuries.  See February 12, 2018 Order at 29.

Moreover, as explained in the February 12, 2018 Order,
Plaintiff's allegations assert that Kimura's reckless handling
of a firearm while impaired was a violation of HPD Policy Number
2.38, and Defendants Naki and Omoso's failure to intervene
allegedly violated HPD Policy Number 2.21.  See February 12,
2018 Order at 30.  According to Plaintiff, these violations of
HPD policy caused her constitutional injury.  Given these
alleged violations of HPD policy, the Court finds any supposed
connection between the "brotherhood" culture of silence and
Plaintiff's injuries too tenuous for the culture to be a moving
force behind Plaintiff's injuries.

### iv.  Failure to Train

The SAC seemingly attempts to state a Monell claim

predicated on allegations that the individual officers were not adequately trained.[13]  <u>See</u> SAC ¶¶ 71-80.  To do so, the SAC must plausibly allege that: (1) the existing training program is inadequate based on the tasks the particular officers must perform; (2) the failure to train constitutes deliberate indifference to the rights of individuals with whom the police come into contact; and (3) the inadequacy of the training actually caused the alleged deprivation of the constitutional right.[14]  <u>Merritt v. Cnty. of Los Angeles</u>, 875 F.2d 765, 770 (9th

---

[13] The Court notes that Plaintiff's opposition brief does not contain a section analyzing her section 1983 claim premised on a failure to train, although there are several general conclusory references to that claim.

[14] As the Court explained in the February 12, 2018 Order:

> "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011). "[T]he need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that policymakers . . . can reasonably be said to have been deliberately indifferent to the need." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 390 (1989).  "Under this standard, [Plaintiff] must allege facts to show that the [Defendant] disregarded the <u>known or obvious</u> consequence that a <u>particular omission</u> in their training program would cause [municipal] employees to violate citizens' constitutional rights." <u>Flores v. Cty. of Los Angeles</u>, 758 F.3d 1154, 1159 (9th Cir. 2014) (emphasis added) (internal quotation marks and citation omitted).  "Absent

Cir. 1989).

First, the SAC must adequately allege that the HPD's existing training program is inadequate in relation to the tasks particular officers must perform. In an attempt to do so, the SAC alleges that Kimura and Defendants Naki and Omoso were trained in accordance with HPD Policy Numbers 2.38 and 2.21 at the time of the incident. SAC ¶¶ 36, 44. The SAC then (inaccurately) alleges that "Kimura's attempt to reload his HPD supplemental firearm was performed in accordance with his official training and duties as an HPD officer under Policy Number 2.38 . . . ." Id. ¶ 37. According to Plaintiff, her injuries could have been avoided if Defendant Honolulu "implemented and enforced a policy that established clear guidelines with regard to identifying and responding to 'impairment' by armed officers, and/or . . . implemented and enforced a policy that prohibited the possession of a firearm . . . while consuming alcohol in any amount." Id. ¶ 77 (emphasis omitted).

---

allegations of specific shortcomings in the training . . . or facts that might place the City on notice that constitutional deprivations were likely to occur, Plaintiff [cannot] adequately [plead] a § 1983 claim . . . for failure to train." Bini v. City of Vancouver, 218 F. Supp. 3d 1196, 1203 (W.D. Wash. 2016).

ECF No. 132 at 31-32.

The Court finds that these allegations do not plausibly allege that Defendant Honolulu's training program regarding the use of supplemental firearms was inadequate in relation to the tasks that the individual officers had to perform.  The fact that Kimura, while off-duty and in a state of impairment at a bar, allegedly attempted to reload his firearm in furtherance of HPD policy does not show that HPD's training program concerning the use of supplemental firearms was inadequate.  Kimura was barred from handling his firearm at the time of the incident pursuant to explicit HPD policy, and the Court cannot find that the need for different training to prevent Kimura's conduct under those circumstances was "so obvious."  See Canton, 489 U.S. at 390.

As to Defendants Naki and Omoso, the SAC alleges that Defendant Honolulu "showed deliberate indifference by failing to adequately train, investigate, supervise, discipline, counsel, and/or retrain" defendants Naki and Omoso to, among other things, "take appropriate and necessary action under color of law to intercede against and/or report any and all instances of firearm mismanagement and/or other threatening conduct by HPD officers."  SAC ¶ 83.  The Court finds these generalized allegations vague and conclusory and therefore insufficient to survive a motion to dismiss.  See Iqbal, 556 U.S. at 678.

Second, the SAC must adequately allege that Defendant

Honolulu's failure to train amounts to deliberate indifference to her constitutional rights. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality— a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." Canton, 489 U.S. at 389; see also Pembaur v. City of Cincinatti, 475 U.S. 469, 483 (1986) (holding that municipal liability attaches where a deliberate choice to follow a course of action is made from various alternatives by the relevant officials). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick v. Thompson, 563 U.S. 51, 62 (2011) (quoting Bd. of Cnty. Com'rs v. Brown, 520 U.S. 397, 409 (1997)). However, a "plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Long, 442 F.3d at 1186 (internal quotation marks and citation omitted).

In an attempt to establish deliberate indifference, the SAC alleges that HPD "acted with deliberate indifference . . . by implementing an official HPD policy that directed officer to possess a firearm while consuming alcohol until the point of

mental and/or physical impairment, thereby creating a
foreseeable risk of death or serious bodily injury." SAC ¶ 75.
In addition, the SAC alleges that HPD "failed to implement an
adequate training program that prohibited the handling of
firearms while consuming alcohol." Id. ¶ 78.

The Court notes that the focus of these allegations is
supposed deficiencies in HPD's policies, rather than any
allegedly inadequate training Kimura and Defendants Naki and
Omoso received under those policies. For example, Plaintiff
contends that HPD's Policy Number 2.38 was inadequate because it
did not prohibit the handling of firearms while consuming
alcohol, but Plaintiff does not allege how or why HPD's training
program with respect to HPD Policy Number 2.38 was inadequate or
amounted to deliberate indifference. Moreover, the Court finds
that Plaintiff's allegations that HPD's training program
amounted to deliberate indifference remain vague and conclusory.
And, as explained in the February 12, 2018 Order, the SAC lacks
any allegations plausibly showing that Kimura or Defendants Naki
and Omoso's actions were a highly predictable consequence of any
alleged lack of training. See February 12, 2018 Order at 34.

Finally, the SAC must plausibly allege that HPD's
inadequate training caused the deprivation of Plaintiff's
federal constitutional or statutory rights. The SAC alleges
only that HPD "proximately and directly exposed Plaintiff to the

41

foreseeable risk of serious harm" because she was "deprived of her constitutional right[s] against unreasonable seizures . . . and substantive due process—including her right to bodily integrity . . . ." SAC ¶¶ 78, 79. The Court has already found, however, that Plaintiff failed to plausibly allege a deprivation of her constitutional rights under the Fourth or Fourteenth Amendments. Accordingly, Plaintiff cannot state a <u>Monell</u> claim based on a failure to train.

## II. Plaintiff's State Law Negligence Claim (Count 4)

The SAC's negligence count is entitled "Negligence claims against all Defendants under Hawaii state law: Ordinary negligence, gross negligence, negligent training and/or supervision, and/or negligence based upon respondent superior liability." SAC at 26. Given the Court's dismissal of Counts 1-3 above (the federal law claims), the Court will dismiss Count 4 without prejudice to Plaintiff re-filing that claim in Hawaii state court.

A district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." <u>See</u> 28 U.S.C. § 1367(c)(3). The United States Supreme Court has noted that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—

will point toward declining to exercise jurisdiction over the remaining state-law claims." <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988), <u>superseded on other grounds by statute as recognized in</u> <u>Fent v. Okla. Water Res. Bd.</u>, 235 F.3d 553, 557 (10th Cir. 2000).  "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966).

The Court has considered the appropriate factors and finds that they weigh in favor of declining jurisdiction over Plaintiff's state-law negligence claims.  Accordingly, the Court declines to exercise supplemental jurisdiction over those claims and dismisses them without prejudice to Plaintiff refiling them in Hawaii state court.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court GRANTS Defendant City and County of Honolulu's Motion to Dismiss the Second Amended Complaint, ECF No. 134, to which Defendants Sterling Naki and Joshua Omoso have filed joinders, ECF Nos. 141, 142 as follows:

1. Counts 1-3 of the Second Amended Complaint are DISMISSED WITH PREJUDICE.

2. The Court declines to exercise supplemental

jurisdiction over Count 4 of the Second Amended
Complaint (asserting state-law negligence claims)
and accordingly Count 4 is DISMISSED WITHOUT
PREJUDICE, and Plaintiff may re-file this claim
in Hawaii state court.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 8, 2018.



Alan C. Kay
Sr. United States District Judge

Park v. City and County of Honolulu, et al., Civ. No. 17-00142 ACK-KSC, Order
Granting Defendant City and County of Honolulu's Motion to Dismiss the Second
Amended Complaint.